Filed 4/7/15

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LANCE FORD,<br><br>    Defendant and Appellant. | A137422<br><br>(San Francisco County<br>Super. Ct. No. 196780) |

Lance Ford appeals after a jury convicted him of first degree murder.  He argues the trial court erred in admitting certain prosecution evidence, excluding certain defense evidence, and calculating sentencing credits.  In the published portion of this opinion we reject appellant's challenge to certain evidence under the confrontation clause.  In the unpublished portion, we modify the judgment to correct an error in sentencing credits, and otherwise affirm.

BACKGROUND

In November 1981, Annie Barcelon was found dead in the basement of her San Francisco apartment building.  Her underwear or nylons were around her ankles and a pair of jeans was two or three feet away from her body.  Her body was taken to the Office of the Chief Medical Examiner for the City and County of San Francisco (Medical Examiner's office) where an autopsy was performed, photographs were taken, and specimens from Barcelon's body were collected.  The Medical Examiner's office assigned case number 81-1612 to the autopsy.  Dr. Amy Hart, the Chief Medical

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I.B, I.C.2, II, and III.

Examiner at the time of the 2012 trial, testified it was her opinion, based on the physical observations in the autopsy report and the autopsy photographs, that Barcelon's death was a homicide caused by manual strangulation. She also opined, based on physical observations recorded in the autopsy report, that there were injuries consistent with sexual assault.[1]

In 2003, DNA testing was performed on two of the specimens collected at the Barcelon autopsy, a vaginal swab and a rectal swab. Both samples contained sperm and DNA analysis showed the sperm in both samples came from the same person. A suspect was identified based on this DNA analysis; as a result, an oral swab of appellant was taken for DNA testing. The DNA testing revealed appellant's DNA profile matched the DNA profile in the sperm on the Barcelon swabs.

In 2011, appellant's cousin told law enforcement officers that at the time of Barcelon's murder, appellant was staying less than a quarter mile from Barcelon's apartment building.

The People also submitted evidence of prior sexual offenses committed by appellant.

Appellant presented evidence relating to the reliability of the autopsy specimens and DNA analysis, which we set forth below in Part I. Appellant also presented evidence that certain physical property evidence, including Barcelon's panties and jeans, were misfiled with another case at the police department. The error was only discovered in 2005 when the attorney representing the defendant in the other case reviewed the contents of the property file.

An eyewitness on the night of Barcelon's murder saw a car that she "didn't feel right about" outside of Barcelon's apartment. The eyewitness could see the driver's silhouette and stated his hair was wavy and down to his shoulders. Appellant presented evidence that his hair at the relevant time did not match this description. Appellant also

---

[1] Additional evidence about the autopsy, specimen collection, and autopsy report is set forth in Part I, below.

presented testimony that in 1981 the police interviewed a suspect with long hair who admitted trying to mislead investigators; in rebuttal, the People submitted evidence that DNA analysis showed this suspect could not have contributed to the DNA present in the Barcelon autopsy swabs.

The jury found appellant guilty of first degree murder (Pen. Code, § 187)[2] and found true a special circumstance allegation that he committed the murder while engaged in the crime of rape (§ 190.2, subd. (a)(17)(C)).

DISCUSSION

I. *Autopsy Report and Specimens*

Appellant challenges the admission of evidence arising from the 1981 autopsy. Specifically, appellant argues (1) the autopsy specimens should not have been admitted because the People failed to lay a proper foundation and to sufficiently establish chain of custody; and (2) the admission of the autopsy report and the labels and writings on the autopsy specimens (and related testimony arising from this evidence) violated appellant's confrontation clause rights. We disagree on both counts.

A. *Background*

1. *Pre-Trial Proceedings*

Appellant first challenged the admission of this evidence in pre-trial motions. At an evidentiary hearing on the motions, Dr. Hart testified in relevant part as follows. Dr. Hart began working at the Medical Examiner's office in 2001. The Barcelon autopsy report indicates that Dr. Norvil Sisson was the responsible autopsy surgeon.[3] Dr. Hart testified she could render an independent opinion on the cause of death based on autopsy photographs and the physical findings in the autopsy report.

The report documents the autopsy specimens that were collected. Dr. Hart was not aware of written protocols existing in 1981 for conducting autopsies or collecting specimens during an autopsy. Dr. Hart was shown photographs of evidence envelopes

---

[2] All undesignated section references are to the Penal Code.

[3] Dr. Sisson was deceased at the time of trial.

3

and test tubes containing the Barcelon specimens. She testified the packaging and labeling was consistent with that used in Medical Examiner's office autopsies conducted in the 1980s. Two of the specimens had labels on them that did not belong to the Medical Examiner's office. Although Dr. Hart did not know who put those labels on, it was not uncommon to see additional labeling placed on evidence after it was released from the Medical Examiner's office. Dr. Hart had no personal knowledge of how or by whom the autopsy specimens were collected and labeled; if the specimens were air dried before being placed in glass tubes and, if so, where they were dried; how the unlabeled swabs were tracked prior to being placed in test tubes; and when the labels were placed on the tubes.

Dr. Hart was not aware of a Medical Examiner's office log documenting the location or movement of specimens in the 1980s. If evidence was released, a notation may have been made on the coroner's register. In this case, the coroner's register indicated that evidence was released to Forensic Science Associates, but there is no notation recording its return.

At an earlier evidentiary hearing, the trial court heard evidence of the DNA analysis of the Barcelon specimens. Matthew Gabriel, an expert in forensic DNA analysis, performed a DNA analysis on a vaginal specimen and a rectal specimen from the Barcelon autopsy, as well as a reference sample he had been provided from the Barcelon autopsy and a reference sample for appellant. The results showed sperm present in both the vaginal and rectal specimens; the sperm from both specimens contained the same DNA profile, which matched appellant's DNA profile. DNA in the non-sperm portions of each sample matched the DNA profile found in the Barcelon reference sample.[4]

Gabriel followed established protocols in conducting this analysis and took steps to safeguard against contamination. There were no indications of contamination or

---

[4] At trial, Gabriel testified that appellant's DNA was also found in the non-sperm portion of the vaginal swab.

4

ambiguous or inaccurate results. To the contrary, Gabriel testified there were indications that the specimens were *not* contaminated or misidentified because of the consistency between the two specimens. He explained, "there were two different items, one from the vaginal swab, one from the rectal swab that went forward with DNA analysis. . . . [E]ach one of those samples had [semen] fractions or components, so the results between the semen donor component was the same for both of those samples. [¶] Likewise, the results for the non-sperm . . . fraction from both of those samples was also consistent. The non-sperm fraction was consistent with coming from Ms. Barcelon. The semen donor profile was consistent with coming from [appellant]. . . . [¶] So conceivably, let's say for the purpose of argument, one of those two samples was mixed with another sample case, . . . . I wouldn't have seen that consistency within this case for those four independent samples."

The trial court denied appellant's motion to exclude the specimens and the autopsy report. With respect to appellant's argument that the People failed to lay an adequate foundation or establish chain of custody, the trial court found: "At this juncture, there is no evidence before the Court that the Court would conclude that there is a significant gap in the chain of custody. While there are not individuals who were there when the samples were taken, the Court notes that Annie Barcelon's blood that was labeled to have been taken from Annie Barcelon was tested and that there is a commonality between the actual specimens and the victim in this case, and that is that her DNA is on the swabs. There's also other DNA, but her DNA is there, and that links it up. There's a case number. [¶] . . . [T]he Court believes that any doubt that will be appropriate for the jury to weigh in this case as to whether or not they believe that those samples were in fact taken from Ms. Barcelon and were properly maintained in custody, but again, it goes to the weight. The Court is satisfied that the People have established their burden regarding chain of custody. And for that reason, I'm denying the due process argument."

The trial court also rejected appellant's confrontation clause argument, finding admission of the autopsy specimens and the observations—but not the cause of death—in the autopsy report would not violate appellant's confrontation clause rights.

5

## 2. *Trial Testimony*

Appellant renewed his objections with a standing objection at trial and a post-trial motion for a new trial.

Dr. Hart and Gabriel testified consistently with their pre-trial testimony. The autopsy report, with the diagnosis and cause of death redacted, was admitted into evidence.[5]

Winefredo Mendoza was a clinical laboratory scientist who worked at the Medical Examiner's office from 1978 to 2005.[6] Mendoza did not participate in conducting autopsies or collecting autopsy specimens. Mendoza picked up specimens from the morgue at the end of the day and brought them to the lab where he processed them. The doctors wrote the case numbers on the specimens. Swabs were sometimes left out overnight to dry.

Mendoza had no personal knowledge of the Barcelon autopsy or how Dr. Sisson prepared for autopsies. Mendoza confirmed that test tubes and test tube labels identifying the specimens inside as from the Barcelon autopsy were the type of test tubes and labels used by the Medical Examiner's office in the 1980s. Writing on the labels included case number 1612, Barcelon's name, the autopsy date, and the doctor's initials. Mendoza identified the handwriting of Dr. Sisson and Dr. Stevens on the labels. Mendoza also identified a specimen that he referred to as a "blood spot." Mendoza explained that during an autopsy, the doctor would typically drip a little of the decedent's blood onto a cotton cloth. Mendoza did not recognize initials or handwriting from a Medical Examiner's office staff member on the blood spot cloth. However, there were notations of the case number, Barcelon's name, and the autopsy date that Mendoza believed may have been written by an investigator in the crime lab. When the DNA analysis was conducted, this blood spot was used as the Barcelon reference sample.

---

[5] The trial court found the autopsy report admissible under the official records exemption to the hearsay rule (Evid. Code, § 1280). Appellant does not challenge this ruling on appeal.

[6] Mendoza testified in part through an interpreter.

6

Dr. Edward Blake testified that in December 1981, he received from the Medical Examiner's office a number of swabs in test tubes identified with case number 81-1612. Dr. Blake did not receive a blood spot on a cloth, but he did receive a bottle of blood from the autopsy that was identified as coming from Barcelon. Dr. Blake made his own notations on the test tube labels. Dr. Blake found sperm on several vaginal swabs, as well as low levels of sperm on two rectal swabs. He returned the swabs to the Medical Examiner's office in 1983.

As part of appellant's case, a videotaped examination of Dr. Michael Slade was played for the jury. Dr. Slade worked as a forensic toxicologist at the Medical Examiner's office from 1979 to 1993. He testified that multiple autopsies were often performed on any given day. Containers for specimens would be lined up in the autopsy suite. In the early 1980s there were no protocols in place describing how autopsy specimens should be labeled. There were also no procedures at that time for keeping track of autopsy specimens or documenting the chain of custody. People who worked in the coroner's office, investigators, and people from funeral homes who had business in the coroner's office all had access to the storage areas where specimens were held.

Doctor Slade was personally aware of two incidents in which biological evidence collected at autopsies in the early 1980s was mislabeled. In one incident, a blood sample showed a high level of alcohol but a sample of fluid from the decedent's eye was negative for alcohol. It was determined that the blood sample was mislabeled and came from another case. In the second incident, the decedent showed indications of carbon monoxide poisoning but his blood sample tested negative for carbon monoxide. Again, it was determined the blood sample was mislabeled and came from another autopsy performed the same day.

Appellant also presented the testimony of Brian Harmon, who performed DNA analysis on a vaginal slide from the Barcelon autopsy in 2006. The slide contained sperm and non-sperm cells, but Harmon was unable to obtain good results. The vaginal slide did not have an airtight seal, exposing the DNA to the surrounding environment. Under

7

such conditions, DNA can degrade; once degraded, it cannot be genetically typed very well.

In the non-sperm portion of the slide, Harmon found DNA from more than one person. One of the DNA profiles in the non-sperm portion of the slide did not match either appellant or Barcelon. This different profile could have resulted from somebody touching the slide or from contamination in storage. Harmon could not tell if the different profile was deposited on the slide at the same time as the other profiles. The sperm portion of the slide contained only one DNA profile. The sperm could have been contributed by appellant; however, because the DNA profile was incomplete, the probability of a match was one in 35 for African-Americans.

B. *Foundation and Chain of Custody*

Appellant argues his due process rights were violated by the admission of the Barcelon autopsy specimens because the People failed to sufficiently establish a foundation for the evidence and an adequate chain of custody. Specifically, appellant argues there was insufficient evidence regarding who collected the specimens; how they were collected, packaged, and labeled; where and how they were stored; and who accessed them.

"In a chain of custody claim, ' "[t]he burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight." ' " (*People v. Catlin* (2001) 26 Cal.4th 81, 134 (*Catlin*).) "While a perfect chain of custody is desirable, gaps will not result in the exclusion of the evidence, so long as the links offered connect the evidence with the case and raise no serious questions of

tampering." (Mendéz, Cal. Evidence (1993) § 13.05, p. 237; accord, *Catlin, supra,* at p. 134.) "The trial court's exercise of discretion in admitting the evidence is reviewed on appeal for abuse of discretion." (*Catlin, supra,* at p. 134.)

We agree with appellant that there are substantial evidentiary gaps in relation to the autopsy specimens. Nonetheless, the trial court did not abuse its discretion in admitting the evidence. First, there was evidence linking the specimens to the Barcelon autopsy. The specimens were packaged in tubes labeled with the case number assigned by the Medical Examiner's office to Barcelon's autopsy, the victim's name, and the autopsy date. The non-sperm portion of both samples contained DNA from the same person, which matched DNA found in a blood spot on a cloth. Although it was not clear whether the blood spot had been labeled at the time of Barcelon's autopsy, there was evidence that, at the time of the autopsy, autopsy surgeons would typically drip a little of the victim's blood onto a cotton cloth, and this blood spot was stored with the other Barcelon autopsy specimens.

Moreover, it is exceedingly unlikely the specimens were mislabeled. Because the same DNA profile was found in all three specimens, all three would have to have been mislabeled. On the day of the Barcelon autopsy, no swabs were taken in any other autopsy. Moreover, because appellant's DNA was found in sperm from the swab specimens, any specimen switch would have to have been with an autopsy involving a decedent appellant had recently had intercourse with. The implausibility of such a scenario is manifest.

Appellant's suggestion the specimens were contaminated or tampered with is similarly unlikely. Both swab specimens would have to have been contaminated or tampered with. As appellant's DNA was found in the sperm and non-sperm portions of the vaginal swab, that swab would have to have been contaminated with both sperm and non-sperm cells from appellant. In addition, the autopsy report documents the presence of "many spermatozoa" in vaginal smears but only one DNA profile was found in the sperm portion of the swabs; therefore, any contamination or tampering with the vaginal swab would apparently have required *removal* of the sperm originally present and

9

replacement with appellant's sperm.  We note also that the likelihood of tampering or contamination is further reduced because appellant was not identified as a suspect in this case until after the DNA analysis of the swab specimens had been conducted.

Appellant contends this case is similar to *People v. Jimenez* (2008) 165 Cal.App.4th 75 (*Jimenez*).  We disagree.  In *Jimenez,* the defendant was identified as a bank robbery suspect based on eyewitness identification.  (*Id.* at p. 78.)  The police subsequently requested a comparison of swabs from a bicycle used as a getaway vehicle with swabs from the defendant obtained after a prior conviction.  (*Id.* at pp. 79–80.)  The DNA from the samples matched.  (*Id.* at p. 79.)  The Court of Appeal found the evidence "fail[ed] to resolve key foundational issues about the chain of custody," including how and by whom the swabs were labeled, sealed, stored, and transferred.  (*Id.* at p. 80.)  The court continued: "The woefully inadequate chain of custody here raises grave concerns about whether the reference sample with which the criminalist compared the handlebar swabs came from Jimenez's cheek or from some altogether different source with no connection to him at all."  (*Id.* at p. 81.)

*Jimenez* is distinguishable.  First, the defendant was identified as a suspect prior to the DNA analysis.  Moreover, there were only two samples being compared to each other, each with only one DNA profile.  As a result, in *Jimenez* there was "no reasonable certainty that the DNA sample purportedly obtained from the defendant and the crime scene DNA had not been substituted for one or the other."  (*People v. Hall* (2010) 187 Cal.App.4th 282, 296; see *id.* at p. 297 [distinguishing *Jimenez* because "Hall's claim of alteration is speculative at best"].)  *Dobson v. Industrial Acc. Com.* (1952) 114 Cal.App.2d 782, cited by appellant, in which there was testimony that a blood sample contained alcohol but "no proof that the blood sample the doctor analyzed was [the plaintiff's] blood," is similarly distinguishable.  (*Id.* at p. 785.)

This is not a case in which " ' "it is as likely as not that the evidence analyzed was not the evidence originally received." ' "  (*Catlin, supra,* 26 Cal.4th at p. 134.)  Instead, "the links offered connect the evidence with the case and raise no serious questions of

tampering." (Mendéz, Cal. Evidence, *supra,* § 13.05, p. 237; accord, *Catlin, supra,* at p. 134.) The trial court did not abuse its discretion.

C. *Confrontation Clause*

Appellant next contends admission of the autopsy report and specimen labels violated his Sixth Amendment right to confrontation absent his opportunity to cross-examine Dr. Sisson or anyone else who personally participated in the autopsy or specimen collection. This argument is inconsistent with current case law.

"[T]he United States Supreme Court has said that generally the Sixth Amendment's confrontation right bars the admission at trial of a testimonial out-of-court statement against a criminal defendant unless the maker of the statement is unavailable to testify at trial and the defendant had a prior opportunity for cross-examination." (*People v. Lopez* (2012) 55 Cal.4th 569, 580–581 (*Lopez*).) "Although the high court has not agreed on a definition of 'testimonial,' testimonial out-of-court statements have two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution. The high court justices have not, however, agreed on what the statement's primary purpose must be." (*People v. Dungo* (2012) 55 Cal.4th 608, 619 (*Dungo*).) "On appeal, we independently review whether a statement was testimonial so as to implicate the constitutional right of confrontation." (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466.)

1. *The Autopsy Report*

In *Dungo*, our Supreme Court considered whether an autopsy report was testimonial. The court began by noting "[a]n autopsy report typically contains two types of statements: (1) statements describing the pathologist's anatomical and physiological observations about the condition of the body, and (2) statements setting forth the pathologist's conclusions as to the cause of the victim's death." (*Dungo, supra,* 55 Cal.4th at p. 619.) Only the former type of statement was at issue in *Dungo*. The court held that such statements, "which merely record objective facts, are less formal than statements setting forth a pathologist's expert conclusions. They are comparable to

11

observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment. Such observations are not testimonial in nature." (*Ibid.*) The court also considered the primary purpose of autopsy reports, concluding that "criminal investigation was not the *primary* purpose for the autopsy report's description of the condition of [the victim's] body; it was only one of several purposes." (*Id.* at p. 621; see also *ibid.* [noting purposes of autopsy reports include helping relatives decide "whether to file an action for wrongful death"; helping insurance companies determine "whether a particular death is covered by one of its policies"; "satisfy[ing] the public's interest in knowing the cause of death"; and "provid[ing] answers to grieving family members"].) The court concluded the defendant's confrontation rights were not violated by his inability to cross-examine the autopsy report's author. (*Ibid.*)

Appellant argues *Dungo* was wrongly decided and relies on the analysis of the dissenting opinion. We are, of course, bound to follow the majority. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Appellant next attempts to distinguish *Dungo*. Appellant contends that, although the trial court redacted the diagnosis and cause of death from the autopsy report, the redacted report nonetheless contained "conclusions." The only example cited by appellant is the following statement: "There are superficial stretch type abrasions across the anterior portions of the clitoris, its sheath and in the area of the external urethra." This statement falls within *Dungo*'s category of "observations"—"statements describing the pathologist's anatomical and physiological observations about the condition of the body"—rather than conclusions—"statements setting forth the pathologist's conclusions as to the cause of the victim's death." (*Dungo, supra,* 55 Cal.4th at p. 619.) Contrary to appellant's suggestion, Dr. Hart's testimony that the injuries described above are consistent with sexual assault does not transform the statement into a conclusion.

Appellant also notes that in *Dungo*, it was unclear whether the testifying pathologist relied "solely on the autopsy photographs, solely on [the] autopsy report, or on a combination of the two." (*Dungo, supra,* 55 Cal.4th at p. 619.) Appellant contends

12

that Dr. Hart's testimony as to the cause of death and likelihood of sexual assault was based solely on the autopsy report; in fact, with respect to the cause of death, Dr. Hart testified her opinion was based on both the autopsy photographs and the physical findings in the autopsy report. In any event, appellant fails to explain the significance of the difference. The only relevance in *Dungo* of the possibility that the testifying pathologist relied on the photographs appears to be that, if the photographs were the sole basis for the testimony, the confrontation clause would not be implicated. (See *id.* at p. 647 (dis. opn. of Corrigan, J.) ["to the extent [the testifying pathologist] had used properly authenticated autopsy photographs to explain his testimony, he would not have disclosed testimonial hearsay"].) This has no bearing on whether the autopsy report is testimonial.

Appellant notes the testifying pathologist in *Dungo* worked with the author of the autopsy report (see *Dungo, supra,* 55 Cal.4th at p. 613), whereas Dr. Hart did not work with Dr. Sisson and had no personal knowledge of his autopsy procedures. Again, appellant does not explain why this distinction—which may bear on the trustworthiness of the report's statements—is relevant to the analysis of the report's testimonial nature.

Finally, appellant points out that the autopsy report was admitted into evidence. In *Dungo*, the court noted the "autopsy report was not introduced into evidence. Thus, we need not decide whether that entire report is testimonial in nature." (*Dungo, supra,* 55 Cal.4th at p. 619.) The relevance of this fact in *Dungo* appears to rest on the court's distinction between observations and conclusions. As the trial court redacted the conclusions from the autopsy report admitted in appellant's case, we do not find the difference significant. In any event, any error in admitting the redacted autopsy report— as opposed to having Dr. Hart "describe to the jury the condition of [the victim's] body at the time of the autopsy" based on the observations set forth in the autopsy report, as was the case in *Dungo* (*id.* at p. 619)—was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

Under *Dungo*, the trial court's decision to admit the autopsy report was correct and did not violate appellant's confrontation clause rights..

This case directly poses the "absent pathologist" problem: if statements in autopsy reports are testimonial under the United States Supreme Court's confrontation clause jurisprudence, how is cause of death established when the pathologist has died or otherwise becomes unavailable before trial? This issue is a small but significant subset of the problems in determining the admissibility under the confrontation clause of expert testimony relating the contents of reports prepared by absent experts that serve as a basis for the witness's opinion. The significance of the autopsy piece was well captured by Justice Breyer in his concurring opinion in *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221]: "Autopsies are typically conducted soon after death. And when, say, a victim's body has decomposed, repetition of the autopsy may not be possible. What is to happen if the medical examiner dies before trial? [Citations.] Is the Confrontation Clause 'effectively' to function ' "as a statute of limitations for murder" '?" (*Williams, supra,* 567 U.S. at p.___ [132 S.Ct. at p. 2251] (conc. opn. of Breyer, J.).)

Challenges to expert basis evidence consisting of out-of-court statements are particularly concerning for several reasons. As with all such issues, the ultimate determination as to whether statements are "testimonial" is lodged with the federal, not the California Supreme Court. Unfortunately, the United States Supreme Court seems firmly deadlocked in a 4-4-1 split on this issue, and that split has, so far, defied efforts to find a rationale that commands a majority. (Compare *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 and *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S. Ct. 2705] with *Williams v. Illinois, supra,* 567 U.S. ___ [132 S.Ct. 2221].) The California Supreme Court has expressly recognized this dilemma. (*People v. Banks* (2014) 59 Cal.4th 1113, 1167; *Dungo, supra,* 55 Cal.4th at p. 616.) But, in attempting to resolve it, our high court has occasionally engaged in line drawing that may prove challenging to apply. Our analysis reflects this. For example, *Dungo* distinguishes a pathologist's observations and conclusions in analyzing whether statements in the autopsy report are testimonial. This distinction may prove difficult to defend over time and is hardly self-evident. (See *Dungo, supra,* 55 Cal.4th at pp. 639–640 (dis. opn. of Corrigan, J.).) And basing the distinction on the determination that observations are less "formal and solemn"

14

lacks any basis in the United States Supreme Court's cases and is inconsistent with previous discussions of formality by the California Supreme Court. (See *People v. Blacksher* (2011) 52 Cal.4th 769, 812–818.) Finally, it is arguable whether *Lopez's* determination that the autopsy was not conducted for the primary purpose of gathering evidence for trial is correct. (See *Dungo, supra,* 55 Cal.4th at pp. 644–645 (dis. opn. of Corrigan, J.).)

It is unknown if or when the United States Supreme Court will articulate a definition of testimonial that clarifies the admissibility of expert basis evidence contained in an autopsy report prepared by an absent pathologist. While a change in opinion by one or more members of the court is possible, it may well require a change in the composition of the court for that to occur. Because autopsies continue to take place there is a need for a prompt modification of the autopsy protocol that will produce both a more reliable record and one designed to survive even a broad definition of testimonial. Suggesting the details of such a procedure is beyond both the scope of this opinion and our expertise. But organizations like the National Association of Medical Examiners, which prepares Forensic Autopsy Performance Standards (*Dungo, supra,* 55 Cal.4th at p. 624 (conc. opn. of Werdegar, J.)), working in conjunction with appropriate representatives of the prosecution and criminal defense bar, should undertake this task.

2. *Specimen Labels*

Appellant also argues admission of the labels on the specimens, which linked the specimens to the Barcelon autopsy by case number and victim's name, violated his confrontation clause rights.

In *Lopez*, the California Supreme Court considered whether a "notation linking [the] defendant's name to blood sample No. 070-7737" in a laboratory report was testimonial. (*Lopez, supra,* 55 Cal.4th at p. 584.) The court answered the question in the negative. As Justice Corrigan explained in a concurring opinion written for a majority of the court, the United States Supreme Court has concluded that " '[b]usiness and public records are generally admissible absent confrontation . . . because—having been created for the administration of an entity's affairs and not for the purpose of establishing or

15

proving some fact at trial—they are not testimonial.' " (*Lopez, supra,* at p. 589 (conc. opn. of Corrigan, J.).)  This opinion concludes: "Entries of the lab number assigned to each sample and the dates on which the sample was received and tested are made 'for the administration of an entity's affairs.' [Citation.]  The laboratory could not conduct its business were it unable to identify samples and track them through the course of their processing.  Records of routine tracking and foundational information are kept by the business to facilitate its ongoing organization and operation." (*Ibid.* (conc. opn. of Corrigan, J.).)

There was evidence that the purpose of writing the case number on the specimen labels was to ensure the specimens were properly tracked by Medical Examiner's office personnel.  As in *Lopez,* the Medical Examiner's office "could not conduct its business were it unable to identify [specimens] and track them through the course of their processing." (*Lopez, supra,* at p. 589 (conc. opn. of Corrigan, J.).)  As the notations on the labels were business records made " 'for the administration of [the Medical Examiner's office's] affairs and not for the purpose of establishing or proving some fact at trial,' " they are not testimonial.  (*Ibid.*)

As the specimen labels were not testimonial, their admission did not violate appellant's confrontation clause rights.

## II.  *DNA Laboratory Incidents*

In pre-trial motions, the parties disagreed about the admissibility of, and defense access to, evidence relating to the crime laboratory which performed the DNA analysis in this case (hereafter, DNA lab or lab).  First, appellant sought to admit evidence of a 2008 DNA lab incident in which a sample was placed out of order during processing (referred to by appellant as a "sample switch"), and incidents in 2008 and 2010 in which samples were contaminated with the DNA of lab employees.  Second, appellant moved to compel the People to disclose a 2010 memorandum from Rockne Harmon (Harmon memorandum) to the San Francisco District Attorney's office.  Appellant challenges the trial court's adverse rulings on both issues.  We affirm.

16

A. *"Sample Switch" and Contamination Incidents*

     1. *Background*

Gabriel, the DNA lab employee who analyzed the Barcelon specimens and appellant's reference sample, testified at a pre-trial evidentiary hearing. He was the DNA technical manager and forensic biology section supervisor at the DNA lab in 2008, when DNA lab analyst Tahnee Nelson found a test tube in the wrong order in a test tube rack while she was processing samples. Nelson gave Gabriel "quite a bit of information about how she was moving the samples around, and she felt very confident that the temporary misordering of these samples was between the reagent blank [a control sample] and the last crime scene sample in the rack." Gabriel testified he was "confident in her descriptions" identifying which samples were misordered, and told Nelson to reorder the test tubes and "put[] benchmarks in place as she moved forward with the analysis process to make sure that what she described was consistent with the subsequent results that were generated." Gabriel did not direct Nelson to retain any original notes about this incident; he did not believe any notes had been generated and, at the time, it was lab policy that such notes were discarded after being transcribed into a computer system. In 2009, a laboratory audit report by an international accreditation organization directed the DNA lab to change this policy and retain original notes even after entry into a computer. During a 2010 audit, Gabriel was not asked about, and did not recall telling auditors about, the Nelson incident.

Keith Inman, an expert in forensic DNA testing, testified for the defense. In his opinion, a laboratory should never destroy original notes. He further opined that reordering misordered samples was not appropriate because it "ignore[s] the possibility of other kinds of problems within the sample set."

The trial court ruled, "while there is some relevance, this incident happened so far after the testing in Mr. Ford's case, and while there is some relevance, [it would involve] the undue consumption of time . . . . It would become so confusing to this jury. It would be a trial within a trial, and so the Court is going to exclude the evidence under [Evidence

Code section] 352, but with the caveat if Mr. Gabriel opens the door, he's going to be cross-examined on this issue."

The contamination evidence involved three DNA lab incidents in 2008 and 2010 in which water control swabs—swabs with only water, used to detect contamination—were found to contain DNA profiles of DNA lab employees. None of the three incidents involved analysts who worked on appellant's case. The trial court excluded this evidence under Evidence Code section 352: "It becomes putting the lab on trial. If there's evidence that there was some contamination in the lab and other irregularities a year before and a year after, that seems to be a relevant time period, but the further we get away from the testing in this case, it becomes less relevant to a point where the relevance is marginalized, because we need to concern ourselves or the Court needs to concern itself under 352 with not confusing the jury and having evidence, really a trial within a trial, as to all these separate events and what happened, and why they would be relevant to something that happened in 2004."

### 2. *Discussion*

Appellant contends the trial court erred in excluding this evidence under Evidence Code section 352. " 'When an objection to evidence is raised under Evidence Code section 352, the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption. Unless these dangers "substantially outweigh" probative value, the objection must be overruled. [Citation.] On appeal, the ruling is reviewed for abuse of discretion.' " (*People v. Hart* (1999) 20 Cal.4th 546, 606.) We need not decide whether the trial court erred because any error was harmless.

Appellant argues the prejudice should be measured by constitutional standards because exclusion of this evidence violated his right to due process. "In general, the ' "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense." [Citations.]' [Citations.] We have recognized, however, that Evidence Code section 352 must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of *significant* probative value to

18

his or her defense. [Citation.] [¶] Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right. [Citation.] Accordingly such a ruling, if erroneous, is 'an error of law merely,' which is governed by the standard of review announced in *People v. Watson* (1956) 46 Cal.2d 818, 836." (*People v. Cunningham* (2001) 25 Cal.4th 926, 998–999 (*Cunningham*).)

We disagree with appellant's characterization of the excluded evidence as having significant probative value. Appellant argues the sample switch evidence was probative with respect to Gabriel's credibility, particularly as to his testimony that he followed proper procedures in analyzing the samples in appellant's case. The sample switch evidence is at best equivocal regarding whether Gabriel followed proper procedures. Gabriel was following the DNA lab's procedures by not directing Nelson to retain her original notes after they were transcribed into the computer system, although there was evidence these procedures were contrary to international standards. While appellant presented opinion testimony that Gabriel's direction to reorder the samples was not appropriate, appellant has not pointed to evidence of a specific policy or procedure that this act violated.

Appellant contends evidence of both the sample switch and contamination incidents was probative to call into question the quality of the work performed by the DNA lab. We do not find the probative value in this regard to be significant. First, the incidents involved errors by different DNA lab analysts (while Gabriel supervised Nelson at the time of the sample switch, there is no evidence that he contributed to the misordering itself). More significantly, the same or similar incidents could not have taken place in appellant's case. The sample switch involved only one test tube out of place, whereas all three of the Barcelon specimens would have to have been misplaced. The contamination incidents all involved samples contaminated with the DNA of lab employees. We note that the trial court did not preclude appellant from presenting any evidence on the reliability of the DNA lab's work. Appellant presented evidence that a

19

specimen from the Barcelon autopsy contained a third DNA profile—other than appellant's or Barcelon's—that could have resulted from contamination.

As the excluded sample switch and contamination evidence lacked significant probative value, any error is reversible only if it is reasonably probable that a more favorable result would have resulted absent the error. (*Cunningham, supra,* 25 Cal.4th at p. 999.) As discussed above, it is difficult to conceive a realistic scenario in which the specimens here were switched or contaminated. It is not reasonably probable that admission of the minimally probative evidence of the sample switch or contamination incidents would have resulted in a more favorable result.

B. *Harmon Memorandum*

1. *Background*

The People provided appellant with page six of the Harmon memorandum. Appellant moved to compel disclosure of the preceding five pages. The People opposed the motion, arguing in part that the Harmon memorandum was protected by the deliberative process privilege and that pages one to five were not material to appellant's defense under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*). The People submitted the Harmon memorandum under seal for the court's in camera review.

The trial court denied appellant's motion. "I've reviewed the [Harmon memorandum], and it doesn't contain any—other than the Page 6 I believe that has previously been disclosed, the rest of the memo, it is deliberative process, which I know if it were *Brady* that would fall by the wayside, but it's not *Brady* material and has little if any relevance. I would go so far as to say it has no relevance in this case whatsoever because of the discussions and what the memo pertains to."

2. *Discussion*

Appellant asked this court to conduct in camera review of the Harmon memorandum; the People did not object to such review. We received from the trial court the sealed copy of the complete Harmon memorandum. Having reviewed the Harmon memorandum in camera, we affirm the trial court's finding that pages one through five of the memorandum contain no *Brady* material. As *Brady* was the only ground on which

20

appellant sought to obtain the Harmon memorandum, we need not decide whether the memorandum is protected by the deliberative process privilege.[7]

III. *Custody Credits*

The trial court awarded appellant credit for 3,172 days in actual custody but denied conduct credits under section 2933.2. Appellant contends, and the People agree, that section 2933.2 does not apply to appellant.

Section 2933.2, which precludes the accrual of custody credit for persons convicted of murder, "shall only apply to murder that is committed on or after the date on which this section becomes operative." (§ 2933.2, subd. (d).) The statute's operative date is June 2, 1998. (*People v. Herrera* (2001) 88 Cal.App.4th 1353, 1366–1367.) Section 2933.2 does not apply to appellant's 1981 murder of Barcelon.

The parties agree that under the operative version of section 4019, appellant is entitled to 1,586 days of conduct credit. We shall direct the trial court to modify the judgment accordingly.

DISPOSITION

The judgment is modified to reflect the addition of 1,586 days of conduct credit and, as so modified, is affirmed. The trial court is ordered to prepare and forward to the California Department of Corrections and Rehabilitation an abstract of judgment modified accordingly.

---

[7] Appellant argues the trial errors he has identified were cumulatively prejudicial and require reversal, even if they were individually harmless. We disagree. To the extent we have assumed error for purposes of analysis, the cumulative impact of any such errors did not prejudice appellant or deprive him of due process and a fair trial. (*People v. Thomas* (2011) 51 Cal.4th 449, 508.)

_____

SIMONS, Acting P.J.

We concur.

_____

NEEDHAM, J.

_____

BRUINIERS, J.

Superior Court of the City and County of San Francisco, No. SC196780, Hon. Anne-Christine Massullo, Judge.

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Gregg E Zywicke and Allen R. Crown, Deputy Attorneys General, for Plaintiff and Respondent.