Filed 8/24/15  P. v. Hinton CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DANIEL DESHAWN HINTON et al.,<br><br>    Defendants and Appellants. | B253708<br><br>(Los Angeles County<br>Super. Ct. No. BA373704) |

APPEALS from judgments of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Deshawn Hinton.

Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant Raymond Lemone Easter.

Kamala D. Harris, Attorney General, Gerald Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, David C. Cook and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendants Daniel Deshawn Hinton and Raymond Lemone Easter appeal from judgments of conviction entered after a jury trial. The jury convicted defendants of the first degree murder of Matthew Butcher (Pen. Code, § 187, subd. (a)) and the attempted willful, deliberate, and premeditated murder of Urban Jones, Jr. (*id.*, §§ 187, subd. (a), 664). The jury found true the special circumstance allegation that the murder occurred while defendants were committing a robbery (*id.*, § 190.2, subd. (a)(17)). The jury also found true the allegations that in the commission of the murder, Hinton personally used a handgun (*id.*, § 12022.53, subd. (b)), and Easter personally used, and personally and intentionally discharged, a handgun, causing great bodily injury and death (*id.*, § 12022.53, subds. (b), (c) & (e)). The jury further found true the allegations that in the commission of the attempted murder, Hinton personally used a handgun, and Easter personally used, and personally and intentionally discharged, a handgun, causing great bodily injury.

The trial court sentenced Hinton to life without the possibility of parole for the murder and a consecutive term of life with the possibility of parole for the attempted murder. It imposed an additional term of 20 years for the use of a handgun in the two crimes. The court sentenced Easter to life without the possibility of parole for the murder, and 14 years to life, consecutive, for the attempted murder. The court also imposed a 25 years to life enhancement, consecutive, on each of the counts pursuant to Penal Code section 12022.53, subdivision (d), for the personal and intentional discharge of a firearm causing great bodily injury or death.[1]

On appeal, Hinton contends his attempted murder conviction must be reversed, in that there is no evidence he aided and abetted Easter in the commission of that crime. Easter challenges the admission of a statement by Hinton and instruction on suppression of the evidence as inapplicable to him. We affirm.

---

[1] The minute order and abstract of judgment inaccurately reflect each of the Penal Code section 12022.53, subdivision (d), enhancements as "25 years" instead of 25 years to life and will be ordered corrected.

2

# FACTUAL BACKGROUND

## A. *Prosecution*

### 1. *The Crimes*

Matthew Butcher (Butcher) was a manager and Urban Jones, Jr. (Jones) was a security guard at the Higher Path Holistic Care Dispensary (Higher Path), a medical marijuana dispensary located on Sunset Boulevard in Los Angeles. Higher Path was equipped with a surveillance system recording activity both inside and outside the dispensary. To make a purchase from the dispensary, a patient rang the doorbell at the locked front door, and the security guard would open the door and let the patient into the reception area. The guard would check the patient's medical marijuana license and then press a buzzer to open the door to the purchasing area, where an employee would assist the patient.

Higher Path maintained a computer database of its patients. Hinton, known to Jones as "Scooter," was a registered patient who had been at the dispensary five or six times. Easter was also a registered patient, who had been at the shop with Hinton four or five times. Hinton had introduced Easter to Jones as his cousin.

On the afternoon of June 24, 2010, Butcher and Jones were eating lunch in the back office of Higher Path when they heard the front doorbell ring. Jones went to the front door and saw a man he did not recognize at the door. He used a remote control to unlock the door. The man said he was a patient, and Jones told him to give his paperwork to Butcher, who had taken a seat at the desk in the reception area. The man then drew a gun and pointed it at Jones' face. He took Jones' gun and ordered Jones and Butcher to lie on the floor, and they complied. He then took the remote control from Jones and unlocked the front door. Hinton and Easter came in. Both had guns. Easter was wearing a red shirt with a black cross on it.

The first man took Jones to the back office and ordered him to remove the cameras and the DVR from the surveillance system, while Hinton and Easter held Butcher at gunpoint. Jones complied. The first man then called out for someone to retrieve the

office computer. Easter came to the office, punched Jones in the eye, and said he would kill him. The first man stopped him, but Easter kept threatening to kill Jones. The first man asked Jones if he had any money. Jones said he only had $4. The man took his wallet, confirmed that Jones had only $4, and threw the wallet on the ground, saying he did not want it. Easter threw Jones against the door and continued to threaten him.

The first man and Easter took Jones back to the reception area, and then they took Jones and Butcher to the back office. The first man asked where the money was kept, and Jones said it was in the safe. The man ordered Butcher to open the safe, and he did so. The man and Easter removed about five pounds of marijuana and a cash box containing $18,000 from the safe. They took it to the purchasing area, where they again had Jones and Butcher lie down on the floor.

Hinton made a call from a cell phone, telling someone, "Hurry up. Hurry up." It looked to Jones, based on the phone case, that Hinton was using Butcher's phone. Easter then took the phone and made some calls.

Easter demanded Butcher's keys, and Butcher said the keys were in his pocket. Easter responded, "Are you trying to be a smart ass? I should kill you right now for being a smart ass." Butcher said, "I'm not trying to be smart with you. They are in my pocket." Easter took the keys from Butcher's pocket and kicked him in the stomach.

Jones heard a car pull into the driveway. The three men took the marijuana, the money, the computer and surveillance system, the cell phone and other items out the back door.[2] Then Easter returned, holding Jones' gun. Jones heard a gunshot and realized he had been shot in the head. He heard a second gunshot, and Butcher stopped moving. Butcher died from a gunshot wound to his head.

Jones felt numbness and pressure in his head, and his vision was impaired. He crawled toward the reception area but was unable to open the door without the remote control. He crawled to the desk and picked up a dumbbell he used to exercise. He used

---

[2]     The other items included Butcher's flash drive, which contained the patient database, and patient files.

4

the desk to get to his feet. With one hand he used the dumbbell to break the glass in the front door. He used the other hand to hold the back of his head so his brain would not come out of the hole in his head. He went outside through the shattered front door and began walking on Sunset Boulevard. He was disoriented and covered with blood. Jones thought he was dying and took out his cell phone to call his mother and say goodbye.

Sarah Flores (Flores), who lived nearby, heard the gunshots and came outside. She saw Jones holding his head and attempting to make a call on his cell phone, which he was holding upside down. He was saying, "Help me." She took his phone and tried to help him. He said, "They robbed us. Scooter and the guys robbed us. They come to the shop all the time." He asked Flores to make a call for him and gave her his mother's number. She called the number. Jones told his mother, "It was Scooter. He lives by the Laundromat. It was Scooter." Flores recalled him telling his mother, "Scooter and three other . . . guys robbed us. They live in the apartments next to the Laundromat. They had everything. I told him not to shoot me."[3]

A man brought over a plastic chair, and Flores and another woman helped Jones sit down. Flores flagged down a patrol car and said Jones had been shot and needed an ambulance. While waiting for the paramedics, Jones told Sergeant Michael Burse of the Los Angeles County Sheriff's Department that "Scooter" shot him, and he pointed to an apartment complex where he said Scooter lived.

The paramedics arrived, and Jones lost consciousness. They transported Jones to the hospital, where emergency room doctors inserted a breathing tube and administered sedatives. He subsequently was given medication to reduce brain swelling, and he underwent emergency surgery to remove bone and bullet fragments from his brain, to ensure there was no bleeding in the brain and to install a titanium plate over the hole in his skull.

---

[3]     Hinton had previously told Jones that he was staying with the mother of his children in her apartment by the laundromat.

## 2. *The Investigation*

The next morning, June 25, Detective James King of the Los Angeles Police Department spoke to Jones in the intensive care unit at the hospital. Jones was not always responsive to the detective's questions, and at times he was incoherent. He did, however, mention the name "Scooter" and say that "Scooter's baby's mama lives in the apartments near the Laundromat."

Detective King returned to the hospital the following day. Jones was more responsive and coherent. He was able to describe three suspects. The first was a stocky man he had never seen before. The second was Scooter, who was a patient at Higher Path. Jones had seen him at the dispensary several times previously. Jones described the third suspect as a skinny man wearing a red and black shirt, with a tattoo on his forearm resembling a cross. Jones had seen suspect number three before at Higher Path. He told Detective King, "suspect 3 shot me."[4]

Butcher's father called Detective King and told him that Butcher's cell phone was still active. Detective King asked him not to cancel the service. Detective King then contacted T-Mobile, Butcher's service provider, and asked it to track the location of Butcher's phone.

The police arrested Hinton and Angela King (Angela), the mother of his children, on July 21. In an interview with Detective King, Angela said that Hinton sometimes lived with his grandmother on East 105th Street in Los Angeles. Hinton also stayed with Angela in her mother's apartment near Higher Path. At some point in June 2010, she and Hinton lived together on Grape Street. Angela also knew Easter, or "Ray," because he was her cousin's father. Hinton had told her that he had stayed at Easter's aunt's home on 105th Street. After the interview, Angela was released.

Detective King also spoke to Hinton. He told him that he thought Hinton had been using "the dead guy's phone."

---

4      Jones subsequently identified Easter as suspect number three from a photographic lineup and confirmed at trial that it was Easter who shot him.

The following day while Hinton was in custody, he made a phone call to Angela. He spoke to Dajuan, a neighbor's son. He said, "Dumbass EB got the horn making a million and one calls. I didn't even know that." Dajuan asked, "Who?" and Hinton responded, "EB, Ebony." Dajuan asked if she had Hinton's phone, and he said, "No, the other bullshit." When Dajuan said he did not understand, Hinton said, "Ray know. Just get in contact with Ray and tell Ray to tell her to slam that shit." Ebony Brown (Ebony) was a friend of Easter's. She lived on South Atlantic Boulevard in Compton.

On September 17, Los Angeles Police Detective Donald Walthers executed a search warrant at an apartment on Saticoy Street in Van Nuys. Britney Haynes, the woman who lived there, confirmed that Easter sometimes spent the night there with her and identified items Easter had left in the apartment the day before. Among the items Detective Walthers recovered was a red shirt with a design on it. Jones identified it as "the shirt that Raymond Easter was wearing when he shot me."

Easter was arrested on September 17. Later that day, he called Ebony. He told her, "My clothes sitting at [Britney's] house. My phone over there. All my shit at KT." Ebony asked if he wanted her to go get it. Easter wavered but told her the apartment number. He added, "But I don't know if cuz went to go get it yet."

The police obtained phone records for cell phones belonging to Butcher, Hinton, Easter, and Ebony. Early on the morning of June 24, Easter's phone made calls using a cell phone tower near Saticoy Street in Van Nuys. Later that morning and early that afternoon, Easter's and Hinton's phones made calls from a tower near 105th Street in Los Angeles. At about 3:40 p.m., Hinton's and Butcher's phones made calls using a cell phone tower near Higher Path.

On the afternoon of June 25, Butcher's cell phone was used to make a call to Easter's cell phone. That evening, Butcher's cell phone made three calls using a tower near South Atlantic Avenue in Compton.

T-Mobile located Butcher's cell phone near Ebony's home on the morning of June 30. That afternoon, Butcher's phone was located near Hinton's grandmother's home on 105th Street in Los Angeles. At about that same time, Hinton's cell phone was

7

used to make calls from a nearby cell tower. Later that afternoon, Butcher's cell phone was returned to the area of Ebony's home.

Cell phone bills showed that during the relevant time period, Hinton's, Easter's, and Butcher's cell phones called many of the same numbers. Ebony's cell phone also made calls to the same numbers as Butcher's cell phone. Both Hinton's and Butcher's cell phones made calls to Easter's cell phone.

## B. *Defense*

### 1. *Hinton*

Eyewitness identification expert Dr. Thomas Streed testified as to the factors that affect a witness' ability to recall the details of a crime, including head trauma. He explained that a witness may subconsciously fill in gaps in memory with details that seem logical and appropriate.

Forensic technologist Jeff Fischbach reviewed the cell phone evidence. It was his opinion that Hinton's and Butcher's cell phones were never in the same place at the same time.

### 2. *Easter*

Jones' mother, Victoria McCullough, testified that when Jones called her on June 24, he described the shooter as having short hair and said the shooter lived in the apartments next to the laundromat, but he did not identify Scooter as the shooter. She next spoke to her son in the intensive care unit after surgery. He said Scooter was present at the time of the shooting, but a man with braids shot him. Jones never said Scooter shot him.

According to Detective King, McCullough initially told him that Jones said Scooter shot him. At the hospital, McCullough confirmed that Jones said Scooter shot him.

Cory Couch also worked as a security guard at Higher Path. He visited Jones in the hospital on June 26. Jones told him that Scooter threatened to kill him and held

8

Jones' own gun to Jones' head.  Jones did not know if Scooter was the one who shot him, however.  Jones also said that Scooter's girlfriend drove the getaway car.

## DISCUSSION

### A. *Sufficiency of the Evidence To Support Hinton's Conviction of the Attempted Murder of Jones*

#### 1. *Standard of Review*

In order to determine whether there is sufficient evidence to support a conviction, "'we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.]  "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]"  [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.  [Citation.]'"  (*People v. Manibusan* (2013) 58 Cal.4th 40, 87; *People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

#### 2. *Aiding and Abetting Liability*

The jury found that Easter was the person who shot Butcher and Jones.  Therefore, Hinton's liability for the attempted murder of Jones must have been based on an aiding

9

and abetting theory. (See *People v. McCoy* (2001) 25 Cal.4th 1111, 1116-1117; CALJIC No. 3.00.)

While an aider and abettor's liability for criminal conduct may be based either on direct aiding and abetting principles or on the doctrine of "natural and probable consequences" (*People v. McCoy*, *supra*, 25 Cal.4th at p. 1117), here the trial court did not instruct the jury on the natural and probable consequences doctrine. It instructed only on a direct aiding and abetting theory.[5] Under direct aiding and abetting principles, "the prosecution must show that the defendant aided or encouraged the commission of the [crime] with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission. [Citation.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 167.) When the offense charged is a specific intent crime, the accomplice must "'"share the specific intent of the perpetrator"'; this occurs when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." [Citation.]' [Citation.]" (*McCoy*, *supra*, at p. 1118, fn. omitted.)[6] When guilt does not depend on the natural and probable consequences doctrine, the aider and abettor of attempted murder must know and share the murderous intent of the actual perpetrator. (*Ibid.*)

---

[5] The jury was instructed pursuant to CALJIC No. 3.01 that "[a] person aids and abets the commission or attempted commission of a crime when he or she: [¶] (1) [w]ith knowledge of the unlawful purpose of the perpetrator, and [¶] (2) [w]ith the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) [b]y act or advice, aids, promotes, encourages or instigates the commission of the crime. [¶] A person who aids and abets the commission or attempted commission of a crime need not be present at the scene of the crime. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting."

[6] "'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*People v. Houston* (2012) 54 Cal.4th 1186, 1217.)

10

3. *Whether Substantial Evidence Supports Hinton's Conviction*

Hinton argues that there was no evidence he did anything to assist Easter in the attempt to kill Jones or that he intended to kill Jones. He claims that while it might be suspected that the robbers planned to kill Jones and Butcher, "evidence that 'merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence . . . .'" (*People v. Watkins* (2012) 55 Cal.4th 999, 1024.)

We conclude the evidence here does more than raise a strong suspicion that Hinton intended to kill Jones. It raises a reasonable inference that Hinton intended to kill Jones, providing substantial evidence to support the conviction. (*People v. Mackey* (2015) 233 Cal.App.4th 32, 120-121.) "A trier of fact may rely on inferences to support a conviction . . . if those inferences are 'of such substantiality that a reasonable trier of fact could determine beyond a reasonable doubt' that the inferred facts are true." (*People v. Rios* (2013) 222 Cal.App.4th 542, 564, citing *People v. Raley* (1992) 2 Cal.4th 870, 890-891.)

The People point out that all three robbers were armed with guns. Hinton and Easter entered the dispensary together already armed. Easter repeatedly threatened to kill Jones, and Hinton did nothing to stop or dissuade him.[7] The evidence shows that Jones, and presumably Butcher, knew Hinton and Easter as Higher Path patients. As they were leaving the premises, Hinton and Easter took items which could identify them, including the entire surveillance system, the computer, Butcher's flash drive and patient files. The latter two items were not shown to have any monetary value. A reasonable jury could conclude the only reason for taking them would be to prevent identification of the robbers. Since Hinton and Easter made a point of taking everything which might identify them as the robbers, it is reasonably inferable that they did not intend to leave witnesses

---

[7] Hinton argues the evidence did not establish that he was in the same room as Easter when Easter made the threats. This factor does not establish that Hinton could not hear the threats being made. Even if he did not hear them, that does not negate the other substantial evidence of Hinton's intent to kill Jones.

11

who could identify them.  It thus is reasonably inferable that Hinton harbored the intent to kill Jones, and his actions in being armed, acting as lookout, turning away a customer who arrived at the dispensary during the robbery, and assisting in removing identifying information aided and abetted Easter in committing the attempted murder.  Substantial evidence supports Hinton's conviction of the attempted murder of Jones on an aiding and abetting theory.

## B. *Admission of Hinton's Phone Conversation with Dajuan*

Easter contends that admission of Hinton's phone conversation with Dajuan, which implicated Easter, violated his Sixth Amendment rights to confront and cross-examine the witnesses against him.  The trial court recognized that admission of the statements created an *Aranda/Bruton* issue.[8]  The court concluded, however, that the statements were nonetheless admissible because they constituted a declaration against penal interest, which "trumps" *Aranda/Bruton*, citing *People v. Cervantes* (2004) 118 Cal.App.4th 162 (*Cervantes*) and *People v. Greenberger* (1997) 58 Cal.App.4th 298 (*Greenberger*).  The trial court also concluded the statements were nontestimonial in nature.  We find admission of the statements was not error.

### 1. *Overview*

In *People v. Aranda*, *supra*, 63 Cal.2d 518, the California Supreme Court held that when the prosecution intends to offer the extrajudicial statement of one defendant which incriminates a codefendant, the trial court must either grant separate trials, exclude the statement, or excise all references to the nondeclarant defendant.  (*Id*. at pp. 530-531.) The court noted "[t]he grave constitutional doubts engendered by [the] present practice of permitting joint trials when the confession of one defendant implicates

---

[8]     *Bruton v. United States* (1968) 391 U.S. 123 [88 S.Ct. 1620, 20 L.Ed.2d 476] and *People v. Aranda* (1965) 63 Cal.2d 518 address the admissibility of a statement by a codefendant.

codefendants . . . ." (*Id*. at pp. 529-530, fn. omitted.) Under *Bruton v. United States*, *supra*, 391 U.S. 123, "'[A] defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating [statement] of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the [statement] only against the codefendant.' [Citation.]" (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1045.)

Both *Aranda* and *Bruton* predate the United States Supreme Court decision in *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354, 158 L.Ed.2d 177]. Under *Crawford* and its progeny, the Confrontation Clause applies only to testimonial out-of-court statements. (*Id*. at p. 68; accord, *Whorton v. Bockting* (2007) 549 U.S. 406, 420 [127 S.Ct. 1173, 167 L.Ed.2d 1]; *Davis v. Washington* (2006) 547 U.S. 813, 822-825 [126 S.Ct. 2266, 165 L.Ed.2d 224].) Where nontestimonial hearsay is at issue, state evidentiary laws apply. (*People v. Arceo* (2011) 195 Cal.App.4th 556, 571; *People v. Garcia* (2008) 168 Cal.App.4th 261, 291; *People v. Cooper* (2007) 148 Cal.App.4th 731, 740-741.) California appellate courts have held that *Crawford*'s testimonial/nontestimonial analysis is applicable to claims that admission of a codefendant's out-of-court statement violates a defendant's Sixth Amendment right to confront the witnesses against him or her. (*Arceo*, *supra*, at pp. 571-572; *People v. Cervantes*, *supra*, 118 Cal.App.4th at p. 172.) Because *Crawford* applies to Easter's confrontation clause claim, the initial determination to be made is whether Hinton's out-of-court statements were testimonial or nontestimonial.

2. *Standard of Review*

"On appeal, we independently review whether a statement was testimonial so as to implicate the constitutional right of confrontation. [Citation.] We evaluate the primary purpose for which the statement was given and taken under an objective standard, 'considering all the circumstances that might reasonably bear on the intent of the participants in the conversation.'" (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466,

13

quoting from *People v. Cage* (2007) 40 Cal.4th 965, 984; accord, *People v. Ford* (2015) 235 Cal.App.4th 987, 995.)

If the statement is determined to be testimonial, we apply the de novo or independent standard of review to claims that implicate a defendant's constitutional right to confrontation. (*People v. Sweeney* (2009) 175 Cal.App.4th 210, 221; see also *People v. Bunyard* (2009) 45 Cal.4th 836, 850.)

If the statement is determined to be nontestimonial, and offered as a statement against interest, we apply the independent standard of review to the trial court's preliminary determination whether the statements "bore sufficiently particularized guarantees of trustworthiness to be admissible." (*People v. Tran* (2013) 215 Cal.App.4th 1207, 1218; accord, *People v. Arceo*, *supra*, 195 Cal.App.4th at p. 577.) We review the trial court's determination that the statement is against a declarant's penal interest under the abuse of discretion standard. (*Tran*, *supra*, at p. 1217; *People v. Wilson* (1993) 17 Cal.App.4th 271, 276.)

3. *Whether Hinton's Statements in the Recorded Telephone Conversation Were Testimonial*

While not defining testimonial hearsay, the *Crawford* court indicated that it includes statements "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (*Crawford v. Washington*, *supra*, 541 U.S. at p. 52.) The *Crawford* court gave examples of the types of statements which would clearly be considered as testimonial including grand jury testimony, prior trial testimony, and statements made in response to police interrogation. (*Id*. at pp. 51-52.)

Post-*Crawford*, the United States Supreme Court has emphasized the "primary purpose" test—whether the primary purpose of the statement is to create an out-of-court substitute for trial testimony. (*Davis v. Washington*, *supra*, 547 U.S. at p. 822; see also *Ohio v. Clark* (2015) ___ U.S. ___, ___ [135 S.Ct. 2173, 2180]; *People v. Dungo* (2012) 55 Cal.4th 608, 619 ["statement is testimonial only if its primary purpose pertains in

14

some fashion to a criminal prosecution"].)  We examine the totality of the circumstances in making the determination whether a statement is testimonial.  (*People v. Barba* (2013) 215 Cal.App.4th 712, 742, fn. 9; accord, *Ohio v. Clark*, *supra*, at p. ___ [135 S.Ct. at p. 2180] [in determining the primary purpose of a statement, the court "must consider 'all of the relevant circumstances'"].)

Relevant circumstances include whether the statements were made "'to enable police assistance to meet an ongoing emergency'" or "'to establish or prove past events potentially relevant to later criminal prosecution.'"  (*Ohio v. Clark*, *supra*, ___ U.S. at p. ___ [135 S.Ct. at pp. 2179-2180]; see *People v. Geier* (2007) 41 Cal.4th 555, 605.)  Another circumstance to consider is the formality or informality of the situation; a formal interrogation is more likely to result in testimonial statements.  (*Ohio v. Clark*, *supra*, at p. ___ [135 S.Ct. at pp. 2179-2180].)  An additional consideration is whether the statement was made to a law enforcement officer or agent (see *Geier*, *supra*, at p. 605) or whether it was made to someone not in law enforcement.  Statements to persons other than law enforcement officers or agents "are much less likely to be testimonial than statements to law enforcement officers."  (*Ohio v. Clark*, *supra*, at p. ___ [135 S.Ct. at p. 2181].)

Here, Hinton's statements were made to an acquaintance, not a law enforcement officer or agent.  They were not made in the course of a formal interrogation, and they were intended to get Easter to take action to conceal or destroy evidence, not to establish or prove past events for the purpose of future criminal prosecution.  Consequently, they are not testimonial, and the confrontation clause was not implicated in their admission.

4. *Whether Hinton's Statements Constituted a Declaration Against Penal Interest Under Evidence Code Section 1230*

Even though admission of the statements did not implicate confrontation clause concerns, we must still determine whether they are properly admitted against Easter under the hearsay exception for statements against interest.  It is Easter's position that

15

Hinton's statements were not against Hinton's penal interest or of sufficient reliability to be admissible.

"In California, '[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true.' ([Evid. Code,] § 1230.) The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character. [Citation.]" (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611.)

As noted in *Greenberger,* "[t]here is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry. [Citations.]" (*Greenberger*, *supra*, 58 Cal.App.4th at p. 334.)

The trial court explained the way it was interpreting Hinton's statements was "that he's saying that Ebony Brown, the idiot, is making phone calls on that phone they got from the situation, and he's ordering his friend to contact Ray to suppress that evidence. So I'm viewing it in two ways, to be candid: one, that's it's a declaration against interest because, in not as direct a way as the cases hold, he's sort of connecting himself to the robbery/murder. But more significantly he's saying something against his interest because he's trying to suppress evidence; he's ordering someone to destroy evidence that might be very important in the case, and that is a declaration against interest because you would only order someone to destroy evidence if you thought the evidence would connect you to a crime and/or you're an accessory after the fact; you're helping someone else by trying to destroy the evidence. Because it's not totally clear from the conversation how strongly he's involved in the incident, but it's very clear that he wants

the phone destroyed and that he has some feeling that EB, by using the phone, is connecting him to a crime, that that's why he wants it destroyed."

In examining Hinton's statements, it is important to note that they were made the day after Detective King told Hinton that he thought Hinton had been using "the dead guy's phone." Thus, Hinton knew the police believed "the dead guy's phone" linked him to the crimes. Acknowledging a connection to the phone and trying to have it destroyed "'so far subjected [Hinton] to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true.' ([Evid. Code,] § 1230.)" (*People v. Duarte*, *supra*, 24 Cal.4th at pp. 610-611; see, e.g., *People v. Wilson*, *supra*, 17 Cal.App.4th at p. 276 [wife's statement that she concealed gun her husband used in a crime "exposed her to criminal liability as an accessory" and thus was a declaration against penal interest].)

Easter's characterization of Hinton's statements as not against penal interest is inaccurate. Easter argues that "Hinton unwittingly made the statements to a person he believed was a trusted ally" and "[h]e perceived no risk to his penal interest at all." The question of whether Hinton perceived an actual risk that the statements would be used against him is not the linchpin of whether the statements were against his penal interest. The statements clearly connected Hinton to at least an attempt to conceal or destroy evidence, if not to the actual murder. Thus, the statements were against his penal interest.

Easter's characterization of Hinton's statements as self-serving and thus unreliable is also inaccurate. While the statements implicated Easter as well as Hinton, there was nothing in the statements themselves or the circumstances under which they were made which suggests they were not "'truly self-inculpatory'" but rather were "'merely [an] attempt[] to shift blame or curry favor.'" (*People v. Duarte*, *supra*, 24 Cal.4th at pp. 611-612, quoting *Williamson v. United States* (1994) 512 U.S. 594, 603 [114 S.Ct. 2431, 129 L.Ed.2d 476].)

First, Hinton was attempting to conceal or destroy evidence that the police said implicated *him*, rather than making statements intended to implicate Easter while minimizing his own involvement in the crimes. Second, Hinton was speaking to a friend

17

or acquaintance he hoped would help him. As noted in *Greenberger*, "Clearly the least reliable circumstance is one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others. 'Once partners in crime recognize that the "jig is up," they tend to lose any identity of interest and immediately become antagonists, rather than accomplices.' [Citation.] However, the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures. [Citations.]" (*Greenberger*, *supra*, 58 Cal.App.4th at p. 335.) While the setting in which the call was made did not foster uninhibited disclosure, it was not a coercive setting in which Hinton was speaking with the police and attempting to better his position at the expense of Easter's.

Hinton was unavailable as a witness, his statements were against his penal interest when made, and they were sufficiently reliable to warrant admission despite their hearsay character. (*People v. Duarte*, *supra*, 24 Cal.4th at pp. 610-611.) Hence, the trial court did not err in ruling the statements admissible as a declaration against interest.

## C. *Instruction Pursuant to CALJIC No. 2.06*

Easter contends his convictions must be reversed because the trial court instructed the jury pursuant to CALJIC No. 2.06[9] on efforts to suppress evidence, and it refused to instruct the jury that the instruction was applicable to Hinton only. Easter claims the instruction was unwarranted as to him, because there was no evidence he attempted to suppress evidence.

---

[9]     CALJIC No. 2.06 provides: "If you find that a defendant attempted to suppress evidence against himself in any manner, such as by destroying evidence [or] by concealing evidence, this attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, this conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."

18

1. *Discussion on Jury Instructions*

Based on Hinton's phone conversation with Dajuan, the trial court stated that it intended to instruct the jury with CALJIC No. 2.06. Easter's counsel objected that the instruction was inapplicable to Easter. The court responded, "That's why we have [CALJIC No.] 2.07, which says, 'Evidence has been admitted against one of the defendants and not admitted against the other.' And I am prepared to tell them that this particular evidence is only being admitted against Mr. Hinton . . . ."

The prosecutor objected, explaining CALJIC No. 2.06 "clearly tells the jury: If you find that 'a' defendant . . . . It does not say that you 'must' find. It doesn't implicate multiple defendants. The court will repeatedly instruct the jury to weigh the evidence as it pertains to each defendant or not pertains to a defendant. So there is no reason that this instruction, as it stands, should not be given to the jury." The trial court agreed and stated it was going to give the instruction over Easter's objection. The court explained that the conversation was circumstantial evidence against Easter. The trial court ultimately instructed with CALJIC No. 2.06 and not No. 2.07.

2. *Applicable Law*

"'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case. [Citations.]' [Citation.]" (*People v. Smith* (2013) 57 Cal.4th 232, 239.)

The trial court "'has the correlative duty "to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues." [Citation.] "It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference [citation]." [Citation.]' [Citation.]"

(*People v. Alexander* (2010) 49 Cal.4th 846, 920-921; accord, *People v. McCloud* (2012) 211 Cal.App.4th 788, 796.)

On appeal, "[w]e conduct independent review of issues pertaining to instructions." (*People v. Cooksey* (2002) 95 Cal.App.4th 1407, 1411; see *People v. Waidla* (2000) 22 Cal.4th 690, 737.) When reviewing the effect of challenged instructions, we look at the instructions given as a whole, "'viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner.' [Citation.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1217; see also *People v. Cain* (1995) 10 Cal.4th 1, 36.) Instructional errors are generally subject to harmless error standard of review, that is, whether there is a reasonable probability of a more favorable result absent the error. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 214; *People v. Watson* (1956) 46 Cal.2d 818, 836-837; *People v. McCloud*, *supra*, 211 Cal.App.4th at p. 803.)

3. *Whether Instruction with CALJIC No. 2.06 Requires Reversal of Easter's Convictions*

As Easter claims, there is no direct evidence that he attempted to suppress or destroy evidence. There is no evidence Dajuan communicated Hinton's message to "Ray," or that Easter told Ebony to stop using or to destroy Butcher's cell phone. Therefore, the record did not support giving CALJIC No. 2.06 as to Easter. (*People v. Alexander*, *supra*, 49 Cal.4th at pp. 920-921; *People v. McCloud*, *supra*, 211 Cal.App.4th at p. 796.) This does not end our inquiry, however, because CALJIC No. 2.06 applied to Hinton and therefore was properly given. The question is whether Easter was prejudiced by the trial court's failure to instruct the jury that CALJIC No. 2.06 did not apply to him.

CALJIC No. 2.06 instructs the jury that if it finds "a defendant attempted to suppress evidence against himself in any manner" the jury may consider that finding as a circumstance tending to show a consciousness of guilt. As the prosecutor pointed out,

20

CALJIC No. 2.06 refers to "a" defendant and permits, but does not mandate, an inference of consciousness of guilt. Thus, the instruction itself made it clear that it did not necessarily refer to both defendants. In addition, the trial court instructed the jury pursuant to CALJIC No. 17.31 that "[w]hether some instructions apply will depend upon what you find to be the facts. Disregard any instruction which applies to facts determined by you not to exist." We may presume the jury followed this instruction and ignored the inapplicable instructions. (*People v. Chism* (2014) 58 Cal.4th 1266, 1299; *People v. Holloway* (2004) 33 Cal.4th 96, 152-153.)

Additionally, it is not reasonably probable that Easter would have been acquitted had the trial court instructed the jury that CALJIC No. 2.06 did not apply to him. The case relied on strong eyewitness identification by Jones, who had seen Easter previously on several occasions and was certain of his identification. (See CALJIC No. 2.92 [factors affecting eyewitness identification include "[w]hether the witness had prior contacts with the alleged perpetrator"].) There also was circumstantial evidence connecting Easter to the crime, including Jones' identification of the red and black shirt worn by the shooter, and the cell phone evidence. Given the extent of the evidence against Easter, there is no reasonable probability that giving CALJIC No. 2.06 without No. 2.07 tipped the scales in favor of conviction.

21

# DISPOSITION

The judgments are affirmed. The trial court is directed to correct the minute order and to amend the abstract of judgment regarding Easter's sentence to reflect that the Penal Code section 12022.53, subdivision (d), enhancement on each of counts 1 and 2 was 25 years to life and to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation.

STROBEL, J.[*]

We concur:

PERLUSS, P. J.

ZELON, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.